1    MATTHEW RIGHETTI      (SBN #121012)
     RIGHETTI ♦ WYNNE
2    456 Montgomery Street, Suite 1400
     San Francisco, CA 94104
3    (415) 983-0900
     fax (415) 397-9005
4

5    Gary D. Greenwald (Ohio Bar # 002480)
     Anne Marie La Bue (Ohio Bar # 0056063)
6    SHAYNE & GREENWALD CO., LPA
     221 South High Street
7    Columbus, OH 43215
     (614) 221-1111
8    fax (614) 221-4070

9    Attorneys for Plaintiffs

10

11                    UNITED STATES DISTRICT COURT

12              FOR THE EASTERN DISTRICT OF CALIFORNIA

13                        SACRAMENTO DIVISION

14

15   GREGORY JOHNSON, WILLIAM        )  Case No.
     RODWELL AND EDWARD RANGEL,      )
16                                   )
                                     )  COMPLAINT FOR VIOLATION OF
17        Plaintiffs,                )  ERISA (29 U.S.C. §§ 1001 et seq.)
          vs.                        )
18                                   )
                                     )
19   CLAIR R. COUTURIER, JR.,  DAVID R. )  JURY DEMANDED
     JOHANSON, ROBERT E. EDDY AND    )
20   THE NOLL MANUFACTURING          )
     COMPANY EMPLOYEE STOCK          )
21   OWNERSHIP PLAN AND TRUST,       )
                                     )
22        Defendants,                )
                                     )
23                                   )
                                     )
24                                   )

25   ────────────────────────────────

26        Gregory Johnson, William Rodwell and Edward Rangel ("Plaintiffs") allege as follows:

27

28

**THE PARTIES**

1.      Plaintiff Gregory Johnson ("Johnson") is a citizen of the State of California and resides in Redwood Shores, California. At relevant times referred to herein prior to October 22, 2002, Johnson was an employee of The Noll Manufacturing Company ("Noll"). Despite his receipt of actuarially vested benefits, Johnson was and is a participant in the Noll Manufacturing Company Employee Stock Ownership Plan (the "ESOP") and a beneficiary of the Noll Manufacturing Company Employee Stock Ownership Trust ("the ESOT"), which implements and forms a part of the ESOP (the ESOP and the ESOT at times referred to herein collectively as the "ESOP"), by virtue of Plaintiffs' claim for recovery of ill-gotten profits which are considered equitably vested benefits under an ERISA plan. *Amalgamated Clothing & Textile Workers v. Murdock*, 861 F.2d 1406, 1419 (9th Cir. 1988).

2.      Plaintiff William Rodwell ("Rodwell") is a citizen of the State of Washington and resides in Eatonville, Washington. Rodwell was at relevant times referred to herein an employee of a division of Noll prior to February 20, 2004 and was and is a participant in the ESOP and a beneficiary of the ESOT.

3.      Plaintiff Edward Rangel ("Rangel") is a citizen of the State of California and resides in Concord, California. Rangel was at relevant times referred to herein an employee of Noll prior to December 31, 2003 and was and is a participant in the ESOP and a beneficiary of the ESOT.

4.      Defendant Clair R. Couturier, Jr. ("Couturier") is an individual residing in Riverside County, California. At relevant times until in or about September 2005, Couturier was the President of Noll, a member of the Noll Board of Directors, the Trustee of the ESOP and an ESOP fiduciary.

5.      Defendant David R. Johanson ("Johanson") is an individual residing in Napa County, California, an attorney at law and a member of the State Bar of California. At relevant times until in or about September 2005, Johanson was the Secretary of Noll, a member of the Noll Board of Directors, legal counsel for Noll and the ESOP, and a named and/or *de facto* ESOP fiduciary.

6.     Defendant Robert E. Eddy ("Eddy") is an individual residing, upon information and belief, in Napa County, California.  Eddy was, since in or about mid-2004, and is, the Trustee of the ESOP and an ESOP fiduciary.

7.     Defendant ESOP is an employee stock ownership plan governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA").  Plaintiffs name the Noll ESOP as a defendant because the EOSP is a necessary party, without which full and complete relief cannot be afforded to Plaintiffs.

**JURISDICTION AND VENUE**

8.     Plaintiffs' First Claim for Relief arises under ERISA.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and Section 502 of ERISA, 29 U.S.C. § 502.

9.     ERISA provides that an ERISA plan "participant" or "beneficiary" has standing to bring a civil action under ERISA Section 502(a), 29 U.S.C. § 1132(a), when that person "is or may become eligible to receive a benefit of any type from an employee benefit plan." ERISA Section 3(7), 29 U.S.C. § 1002(7).

10.     Plaintiffs bring the First Claim for Relief in their capacity as plan participants under 29 U.S.C. § 1132(a)(2), to recover appropriate equitable relief under 29 U.S.C. § 1109(a), and under 29 U.S.C. § 1132(a)(3), to pursue the equitable remedy of a constructive trust imposed on the plan fiduciaries' ill-gotten profits.

11.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b).  At all times material herein, Defendants have been actively conducting business in the State of California and within the geographic area encompassing the Eastern District of the State of California. Venue is further properly laid in this district pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2) in that the subject employee benefit plan is administered in this district and the cause of action arose in this district.

**FACTS COMMON TO ALL CLAIMS**

12.     Noll was started as a business in or about 1942 by Robert E. Noll to engage in the manufacture of sheet metal products.  Noll was first incorporated in 1956 under the laws of California. By the year 2000, Noll was a producer of galvanized sheet metal products consisting

primarily of furnace pipe and fittings, rain gutters and downspouts, metal building products, galvanized ware and plastic ventilation products.

13.     Upon information and belief, during the 1970's, Robert E. Noll, as the sole shareholder of Noll, formed the ESOP for the benefit of employees with over one year of service and not otherwise covered under collective bargaining agreements.

14.     Prior to 2000, Noll made contributions to the ESOP, which contributions were utilized to purchase common shares of Noll stock from Noll, from Robert E. Noll before his death, and from his surviving spouse, Patricia R. Noll, after his death.

15.     On or about March 15, 1980, Robert E. Noll died and the Robert E. Noll Trust became the successor to all Noll shares which he owned individually before his death. After that date, Patricia R. Noll was the controlling shareholder of Noll, and Barry K. Miller was a member of the Noll Board of Directors and company President.

16.     During 1968, Noll acquired Northwest Metal Products Company ("Norwesco"), a manufacturing company, as a division of Noll. Norwesco operated in Kent, Washington until in or about 1998, when it moved operations to Fife, Washington. In 1986, Noll acquired the assets of General Metal Craft Co. ("General Metal"), a manufacturing operation located in Portland, Oregon.

17.     Defendant Couturier was manager of the General Metal manufacturing plant at the time Noll acquired General Metal. After the acquisition, Noll closed the Portland, Oregon plant and moved its operations to Noll's Richmond, California facility and Norwesco's Kent, Washington plant. Couturier was retained by Noll and appointed Manager for both plants.

18.     Prior to 1998, Noll maintained its manufacturing facility in Richmond, California. During 1998, Noll completed the sale of its Richmond manufacturing facility and relocated to a new manufacturing facility in Stockton, California, where the operation remains located today.

19.     Upon information and belief, as of June 30, 2000, the ESOP owned 57,573 shares of the company's Common stock which represented approximately 25% of all shares of Noll Common stock issued and outstanding. At that time, the common shares were the only class of Noll stock issued.

20.     Contributions to the ESOP were determined annually at the discretion of the Noll Board of Directors.  Upon information and belief, contributions in 1999 and 2000 were $348,540 and $356,461 respectively.

21.     Independent appraisal firm Moss Adams Advisory Services prepared an annual valuation of the Noll common shares, which valuation was $119.46 and $112 per share as of June 30, 1999 and June 30, 2000 respectively.

22.     Upon information and belief, Mr. Miller served as a member of the Board of Directors and Noll President until in or about 2000 when he became ill.  In or about 1999, pursuant to a leadership transition plan, Couturier was elected to the Noll Board of Directors.  In 2000, Mr. Miller appointed Couturier to succeed him as Noll President.  In 2001, Mr. Miller died.

23.     Upon information and belief, in or about 2000, Couturier established a business relationship with attorney Johanson, who explained to Couturier how he could use control of Noll and its ESOP to enrich himself at the ESOP's expense.  Upon information and belief, Johanson was initially hired to represent the ESOP through its Trustee Glen J. Beauchamp, Noll's Chief Financial Officer.

24.     In the spring of 2001, the Noll Board of Directors consisted of Patricia R. Noll, Thomas J. McIntosh (attorney for Noll, officer of Noll, co-trustee with Patricia R. Noll of the Robert E. Noll Trust and officer and director of The Noll Foundation, Inc.) and Couturier.

25.     Upon information and belief, by March 2001, Johanson was purporting to represent the interests of the ESOP, but instead was using his representation to set in place a plan that would unjustly enrich Couturier and himself.

26.     Sometime between April and June 2001, Mr. Beauchamp retired and Couturier replaced him as the sole ESOP Trustee.

**ESOP Buyout Of All Noll Shares**

27.     Upon information and belief, Couturier and Johanson developed a plan under which the ESOP would acquire all of the issued and outstanding shares of Noll through a buyout of Patricia R. Noll, the Robert E. Noll Trust and all other non-ESOP shareholders (collectively

the "Selling Shareholders"), Couturier and Johanson would be placed in total control of the Noll Board of Directors and the ESOP, and the Noll Board of Directors would then secretly adopt incentive stock option agreements, stock warrant agreements, deferred compensation agreements and other compensation agreements which would substantially dilute the ESOP's interest in Noll and unjustly enrich Couturier and Johanson.

28.    Prior to the Closing of the ESOP's purchase of stock from the Selling Shareholders, pursuant to the advice and instructions of Johanson, Noll common stock was to be converted into common stock and preferred stock (the "Recapitalization Plan"). The ESOP would then purchase all of both classes of stock from the Selling Shareholders, giving the ESOP 100% ownership and control of the Company.

29.    Upon information and belief, on March 26, 2001, Johanson met with the ESOP participants, explained the buyout and Recapitalization Plan and requested that the participants exercise their pass-through voting rights to approve the Plan. Upon information and belief, the Recapitalization Plan was approved by vote of a majority of the participants based upon the representation that such Plan was in the best interests of the ESOP and that the creation of preferred stock would benefit participants by allowing plan contributions and annual dividends on the preferred shares to exceed the IRC §415 limitations on annual contributions.

30.    At no time before the vote did Johanson or Couturier explain to participants that their plan was to adopt stock options and other incentive agreements for the benefit of Couturier which would substantially dilute the ESOP's interest in Noll and provide Couturier excessive and unreasonable compensation.

31.    Upon information and belief, Couturier, acting as the sole member of the ESOP Board of Trustees, and the Selling Shareholders entered into an ESOP Stock Purchase Agreement dated June 2001 under which the ESOP purchased all of the Selling Shareholders' shares for a total purchase price of $20,543,446.00. This transaction (the "Transaction") closed on June 20, 2001.

32.    Upon information and belief, the purchase price was paid in cash at the Closing with funds borrowed by Noll from Union Bank of California ("Union Bank") in the amount of

$23,000,000. Noll loaned to the ESOP Trust the full amount of the purchase price (the "ESOT Loan"), evidenced by a secured promissory note from the ESOT to Noll in the amount of $20,543,446.00 (the "ESOT Note").

33.    Pursuant to an ESOT Loan and Pledge Agreement, Noll was required to make contributions to the ESOT in amounts which, when combined with any cash dividends which were paid on the company preferred stock acquired with the ESOT Note, would be sufficient to enable the ESOT to make all principal and interest payments on the ESOT Note to Noll and for Noll to repay Union Bank on its loan to Noll.

34.    Upon information and belief, at the time of the Transaction, Noll had average net sales of approximately $40,000,000, retained earnings of approximately $44,000,000 and a net worth of approximately $52,000,000 (on a pre-Transaction basis).

35.    Upon information and belief, the ESOP's common stock on a minority basis had a fair market value of approximately $120.00 per share and the preferred stock on a majority basis had a fair market value in excess of $180.00 per share pre-Transaction. Upon information and belief, the Transaction debt reduced the fair market value of the common stock and the preferred stock on a majority basis to approximately $60.00 per share and $90.00 per share respectively post-Transaction.

36.    As in all ESOP leveraged transactions, it was expected that the fair market value of the common stock and preferred stock owned by the ESOP would rise each year as the ESOP repaid the ESOT Loan to the Company, which would use these funds to repay its loan to Union Bank and utilize the tax benefits thereof.

**Execution Of Concealed Couturier Incentive Agreements**

37.    During the course of the Transaction, Johanson was legal counsel for the ESOP while Thomas J. McIntosh served as legal counsel for Noll, Patricia R. Noll, The Noll Foundation, Inc. and the Robert E. Noll Trust. In addition, Mr. McIntosh was an officer and director of Noll at the time of the Transaction, but resigned his positions as officer, director and legal counsel of Noll shortly after the Transaction closed.

38.   During the Transaction, Johanson prepared most of the documents and delivered same to Mr. McIntosh for review.  Prior to the Transaction, Johanson provided Mr. McIntosh with certain agreements entitled the Noll Manufacturing Company 2001 Equity Incentive Plan and the Noll Manufacturing Company Value Enhancement Incentive Plan (collectively the "Couturier Incentive Agreements") which were intended to provide Couturier with stock options, stock rights and bonus compensation based upon a formula that measured the increase in the value of Noll stock post-Transaction.

39.   Upon information and belief, Mr. McIntosh recognized that the formula for measuring Couturier's benefit to Noll was artificial and unfair because he had been told by Johanson and the ESOP appraiser that the Transaction would cause the value of the stock to drop to about half of the $119.00 per share pre-Transaction value because of the large bank loan obtained to undertake the Transaction and that the stock value would increase as the loan was paid down.  Mr. McIntosh called Johanson and expressed his concerns and objections to the proposed Couturier Incentive Agreements, which required approval of the Noll Board of Directors.

40.   Upon information and belief, Mr. McIntosh advised Johanson that, as a director of the company, he would not approve the Couturier Incentive Agreements.

41.   The Couturier Incentive Agreements were unreasonable, created excessive and unjust compensation and benefits to Couturier and were not in the best interests of the ESOP.  At the time such agreements were prepared, Johanson was representing Couturier in his personal capacity and acted with a conflict of interest with respect to the ESOP as a client.

42.   Upon information and belief, on June 20, 2001, at a pre-closing or closing meeting held in a conference room at the Monaco Hotel in Seattle, Washington, Couturier called a Board of Directors meeting for Noll and voted on approval of the Couturier Incentive Agreements.  Upon information and belief, despite Mr. McIntosh's refusal to vote in favor of the Couturier Incentive Agreements, Johanson's motion to approve the Couturier Incentive Agreements was passed by Couturier's vote and the vote of another director controlled by Couturier.

43.     Upon information and belief, that same day or the day following the meeting, Couturier and Johanson forced Mr. McIntosh to resign as corporate secretary and elected Johanson in his place. Johanson prepared the corporate minutes of such meeting.

44.     Upon information and belief, Johanson was elected a director of Noll soon after the Transaction and he was also appointed corporate legal counsel to replace Mr. McIntosh.

45.     Upon Johanson's request, Mr. McIntosh delivered all of his corporate files and Transaction documents to Johanson, who has kept them locked away from the ESOP participants.

46.     In or about October 1, 2001, less than four months after the Transaction, Couturier and Johanson incorporated N&NW Holding Company, Inc. ("N&NW") as a California corporation electing S Corporation status to engage in a stock for stock exchange with Noll. Couturier caused the ESOP to transfer its 212,187.2707 shares of Noll to N&NW in exchange for a similar number of N&NW shares of common stock (the "Tax-Free Reorganization").

47.     As a result of the Tax-Free Reorganization, N&NW owned 100% of all capital stock of Noll and the ESOP owned all Common stock of N&NW.

48.     After the Tax-Free Reorganization, the ESOP owned no preferred stock and received no dividend stream there from. Upon information and belief, Couturier, as ESOP Trustee, approved the Tax-Free Reorganization but never requested nor received any benefits from the Company to compensate the ESOP for the loss of the dividend stream associated with the preferred stock.

49.     Upon information and belief, N&NW granted Couturier stock options in 2002 at a price substantially below the then current fair market value, vested and exercisable over a five year period as a result of the Couturier Incentive Agreements. Commencing in 2002, the share rights associated with the stock options to Couturier began to dilute the per share value of the ESOP's stock appraised each year by Moss Adams Advisory Services.

50.     Upon information and belief, Couturier and Johanson elected themselves Directors and Officers of N&NW. Thereafter, acting as Directors of N&NW, they approved

additional Couturier Incentive Agreements, based upon the issuance of equity rights and/or compensation or bonuses tied to the amount of debt repayment on the ESOT Loan.

51.     Upon information and belief, during 2002 and 2003, Couturier received additional stock options and other benefits resulting from the Couturier Incentive Agreements which further diluted the per share value of the ESOP's annual stock appraisal and resulted in retiring or otherwise departing ESOP participants receiving less than the true fair market of their ESOP shares.  By January 2004, Couturier was the largest beneficial owner of ESOP shares, warrants and other stock interests amounting to approximately 2/3 of the effective equity of Noll.

**Departure Of ESOP Participants**

52.     Upon information and belief, Couturier fired employees such as Plaintiff Greg Johnson whenever they raised questions regarding the handling of the ESOP and/or Couturier's compensation from Noll.  Mr. Johnson was terminated by Couturier, acting through supervisor Mark Comfort, on October 22, 2002.

53.     In 2003, Couturier pressured a number of key employees of Norwesco, who had substantial ESOP accounts, to take an early retirement and receive their ESOP benefits while the per share fair market value was artificially lowered by the leveraged ESOP debt and Couturier's dilutive option shares and share rights.

54.     Upon information and belief, Couturier has terminated a number of other long-term employees who were ESOP participants or has taken action to force their early resignation or retirement.  Upon information and belief, these actions were taken to increase Couturier's interest in the ESOP stock and to eliminate persons who might assert a cause of action against him if they learned of his acts of wrongdoing.

**Plot To Loot Noll Of Its Assets**

55.     While the ESOP participants had no knowledge of Couturier's acquisition of a controlling beneficial interest in Noll or N&NW, Johanson plotted with Couturier in 2003 for Couturier to secretly sell his controlling beneficial interest in N&NW to the ESOP for millions of dollars.

56.     Upon information and belief, this scheme was to be carried out after Noll and Couturier formed a new entity known as The Employee Ownership Holding Corporation ("TEOHC"), a Delaware corporation, and then completed a third recapitalization involving Noll, N&NW and TEOHC (the "Third Recapitalization").

57.     During the last six (6) months of 2003, Couturier and Johanson began to announce to employees that Noll and N&NW needed to engage in the Third Recapitalization arrangement involving TEOHC so that Noll would have the ability to effectuate early retirement distributions for the employees that Couturier was encouraging and pressuring to take early retirement.

58.     In fact, these announcements were misleading and false.  Johanson and Couturier instead intended to use the Third Recapitalization to cover their plan for Couturier to secretly receive his personal retirement package amounting to $15,000,000 or more secreted from the Noll assets.

59.     Upon information and belief, Johanson represented to Couturier that he could secretly arrange for a private investment company to consummate the ESOP's purchase of Couturier's shareholder interests in N&NW and Couturier could then walk away with millions of dollars for his personal retirement package, representing all or substantially all of the equity of Noll.

60.     To accomplish this and to personally enrich himself, Johanson, together with Dan Mytels, formed a company called Zenith Capital Partners LLC ("Zenith") in January 2004 to contract with Couturier and TEOHC as successor to Noll or N&NW.  Under their contract, Zenith would secure the required lender and/or investor financing to facilitate the buy-out of Couturier's interest in TEOHC, and would be paid an annual management service fee of not less than $100,000, annual board of trustee fees of not less than $20,000, warrants equal to 5% of the fully diluted shares of TEOHC capital stock, with an exercise price of 100% of the post-initial closing date fair market value of TEOHC's capital stock, inter alia.  Johanson intended to reap substantial profits from this transaction and his partial ownership in Zenith.

61.     In or about February 2004, Noll and Couturier completed the Third Recapitalization of Noll & N&NW under which the entity known as TEOHC was formed as a Delaware corporation and the ESOP then exchanged all of its capital stock in N&NW for all of the outstanding capital stock in the newly-formed entity TEOHC.

62.     In a lawsuit styled *Zenith Capital Partners LLC v. Clair R. Couturier, Jr. et al.*, Case No. 26-28162 in the Superior Court of California, County of Napa (the "Zenith lawsuit"), Zenith alleged that in or about February 2004, Noll and Couturier created TEOHC and completed a recapitalization of Noll, by which the ESOP exchanged all of TEOHC's outstanding capital stock for all stock and other interests held by Couturier, the loan obligations of the ESOP, and any and all options and warrants held by TEOHC's options and warrant holders. In the complaint, Zenith alleged that Johanson, as corporate counsel for TEOHC, conceived, designed and facilitated this transaction which resulted in Couturier converting all of his share interests except ESOP shares to promissory notes from TEOHC.

63.     Based upon information and belief from the Zenith lawsuit, Plaintiffs aver that in February 2004, the ESOP exchanged all of TEOHC's outstanding capital stock for all of Couturier's existing capital stock and other interests in Noll and N&NW. Couturier received promissory notes from TEOHC in amounts exceeding $15,000,000.

64.     This transaction (the "February 2004 Transaction") was never disclosed to the ESOP participants and was completed without independent counsel representing the ESOP and the corporate parties thereto. Rather, upon information and belief, Johanson purported to represent all parties to the Transaction. Such action of engaging in the February 2004 Transaction by Johanson and Couturier was a blatant conflict of interest and a fraud upon the ESOP and the corporate participants. The February 2004 Transaction was intended as an initial step in Couturier's removal of more than $15,000,000 of Noll assets and Johanson's receipt of more than $1,000,000 of compensation for structuring the transaction.

65.     According to the Zenith lawsuit, in or about April 2004, Couturier requested that Zenith proceed with a new transaction to convert his TEOHC promissory notes into cash.

66.     On or about June 19, 2004, Zenith entered into a written agreement with Couturier, TEOHC and the ESOP under which TEOHC would purchase all of Couturier's equity and equity-like interests in TEOHC for a purchase price believed to be in excess of $15,000,000. In this proposed transaction, Couturier would receive a mixture of cash payable on or about July 21, 2004, as well as other high value real and personal property.

67.     Zenith obtained offers for complete financing of the transaction, but, upon information and belief, Couturier and Johanson decided to breach the contract and proceed on their own without Zenith.  Zenith subsequently filed the Zenith lawsuit to recover damages from Couturier, Johanson and TEOHC for breach of contract and intentional interference with contractual relations among other claims.

68.     Upon information and belief, Johanson and Couturier elected to obtain financing for the buyout of Couturier's equity interests from sources other than those which Zenith had obtained.  Notwithstanding, Johanson and Couturier obtained bridge loan financing for the buyout from Bank of America, which was one of the financing sources obtained by Zenith. Couturier accepted bridge loan financing from Bank of America so that the buyout transaction could proceed by July 2004.

69.     On or about July 20, 2004, Couturier obtained three separate loans from Bank of America, which totaled $24,785,000, secured by first mortgages on valuable real estate owned by Noll and its subsidiaries.

70.     The loan proceeds to TEOHC were used in substantial part to repay part of Couturier's promissory notes and to fund Couturier's "retirement package."

71.     Upon information and belief, Johanson has personally received and will continue to receive substantial profits from the financing and buyout transactions.

72.     In or about August 2005, Couturier and Johanson obtained financing from Union Bank which repaid Bank of America and permitted Couturier to receive the full cash payout on all of his unpaid promissory notes from TEOHC.  Upon information and belief, Couturier retired from Noll at that time and received a full cash payout exceeding $15,000,000.

**Retention Of Robert Eddy To Serve As ESOP Trustee**

73.     Prior to 2004, Johanson had established a close working relationship with Robert Eddy, a San Diego securities broker employed by Wachovia Securities. Upon information and belief, Eddy was Couturier's personal stock broker investment advisor. Johanson had used his influence and control over ESOP clients to appoint Eddy as an ESOP trustee or fiduciary to approve ESOP transactions designed by Johanson. In such cases, Eddy received substantial fees for approving ESOP transactions constructed by Johanson.

74.     Upon information and belief, in connection with the Third Recapitalization and transfer of Couturier share interests to the ESOP, Johanson caused Couturier to step down as ESOP trustee and Johanson and Couturier appointed Eddy to replace Couturier as an ESOP fiduciary to approve the Third Recapitalization and related transactions.

75.     Johanson and Couturier purported to appoint Eddy to serve as an independent trustee to review the transactions, determine their impact upon the ESOP and to approve or disapprove of such transactions based upon the best interests of the ESOP and all of its participants. In fact, Johanson and Couturier represented to the ESOP participants that Eddy was an independent trustee and would act solely in the interests of the ESOP and all of its participants.

76.     Instead, Eddy was neither independent nor qualified to serve as an independent trustee and acted under the control, direction and supervision of Johanson and Couturier. Eddy failed to act prudently and solely and exclusively for the best interests of the ESOP. Rather, Eddy served the interests of Johanson and Couturier as their agent.

77.     Upon information and belief, Couturier and Johanson have, effective September 2005, resigned all of their positions with TEOHC, N&NW, Noll and the ESOP and walked away with millions of dollars misappropriated from Noll and the ESOP, but have left Eddy in charge of the ESOP to assure that no legal actions will be instituted against them.

FIRST CLAIM FOR RELIEF - FOR VIOLATION OF ERISA

78.     Plaintiffs reassert the foregoing allegations as if fully rewritten herein.

79.     Pursuant to Section 404 of ERISA, 29 U.S.C. § 1104, a fiduciary with respect to a qualified retirement plan is required to discharge his duties solely in the interests of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to participants and their beneficiaries, with the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use for the conduct of an enterprise of like character with like aims.

80.     Pursuant to Section 406 of ERISA, 29 U.S.C. § 1106, transactions between a plan and a party in interest or a fiduciary are prohibited subject to the exemptions set forth in Section 408 of ERISA, 29 U.S.C. § 1108.

81.     At all relevant times as set forth herein, Couturier, Johanson and Eddy exercised discretion to administer, control and/or manage the ESOP or its assets.

82.     At all relevant times as set forth herein, Couturier, Johanson and Eddy were fiduciaries and parties in interest as defined by ERISA and were required to act with the highest degree of skill, prudence, diligence, loyalty and due care to the ESOP participants and beneficiaries with respect to any decisions or acts affecting the ESOP.

83.     By engaging in the acts and transactions set forth herein, Defendants have engaged in breaches of fiduciary duty and prohibited transactions in violation of ERISA.

84.     Defendants are also liable as co-fiduciaries under ERISA Section 405(a)(1), (a)(2) or (a)(3), with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches and/or knowingly undertook to conceal those breaches, enabled their co-fiduciaries to commit the breaches and failed to make reasonable efforts to remedy the breaches.

85.     Defendants are also liable for failing to sue themselves by way of a derivative action and/or a legal malpractice action on behalf of the ESOP to remedy their breaches of duty. An ESOP fiduciary who also serves as an officer or director of the sponsoring employer can be charged with knowledge of any improper actions that he took as an officer or director, and his failure to act prudently on the basis of that knowledge violates the fiduciary duties that he owes under ERISA. *Delta Star, Inc. v. Patton,* 76 F.Supp.2d 617, 637 (W.D. Pa. 1999), citing *Canale*

*v. Yegan,* 782 F.Supp. 963, 968 (D. N.J. 1992).   An ESOP trustee has a duty to bring a derivative action if he is aware that officers and directors of the sponsoring company have breached their fiduciary duties to the shareholders; "that this would require the ESOP trustee to bring suit against himself does not relieve him of this duty under ERISA." *Delta Star* at 637, citing *Atwood v. Burlington Indus. Equity, Inc.,* No. 2:92CV00716, 1994WL698314, at *9 (M.D.N.C. August 3, 1994).

86.     In breaching their duties and dealing with the ESOP assets for their own interests as set forth herein, Defendants abused and put at risk ESOP assets belonging to the entire ERISA plan.

87.     In the alternative, as relates to Johanson, and only to the extent that Johanson may be determined to be a nonfiduciary with respect to the ESOP, Johanson is liable as a party in interest under ERISA Section 3(14)(B), 29 U.S.C. § 1002(14)(B) for knowingly participating in a prohibited transaction or transactions involving the Noll ESOP and for knowingly participating in other ERISA violations knowingly undertaken by the Noll ESOP fiduciaries as set forth herein. *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 248-49, 251 (2000).

88.     One of ERISA's overriding goals is to prevent the misuse and mismanagement of plan assets by fiduciaries. *See Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140-43 & n. 8 (1985) (discussing congressional purpose of establishing judicially enforceable standards to ensure faithful, honest and competent management of plan assets).

89.     To achieve that goal, ERISA Section 409(a), 29 U.S.C. §1109(a) requires a fiduciary to disgorge to an employee benefit plan any profits he makes through improper use of the plan's assets. *Id.* ("a fiduciary ... shall be personally liable ... to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan").

90.     A constructive trust remedy is available under the catch-all relief provisions of both ERISA Section 409(a) and Section 502(a)(3). *Amalgamated Clothing & Textile Workers Union v. Murdock*, 861 F.2d 1406, 1413 (9th Cir. 1988).

91.     A constructive trust remedy is necessary to deny the breaching fiduciaries profits from their breach and to deter future breaches of ERISA's duty of loyalty. *Id.* at 1414.

92.     A constructive trust remedy may be imposed "*in favor of plan participants and beneficiaries even after they have received their actuarially vested plan benefits.*" *Id.* at 1413 (emphasis in original); *Waller v. Blue Cross of California*, 32 F.3d 1337, 1339 (9th Cir. 1994).

93.     Defendants Couturier, Johanson and Eddy have personally enriched themselves by generating profits from the wrongful acts alleged herein.

94.     A constructive trust in favor of all participants and beneficiaries is the only available means of removing the ill-gotten profits.

95.     As a proximate result, the ESOP and its participants and beneficiaries are entitled to the imposition of a constructive trust upon Defendants' ill-gotten profits in an amount to be determined at or before trial.

96.     By engaging in the breaches of fiduciary duty set forth herein, Defendants at all relevant times acted as conflicted fiduciaries. Unless Defendants' agent and appointee, Eddy, is removed from his current position as ESOP Trustee, Defendants will continue to engage in wrongful acts including, but limited to, concealment of their breaches, to the continuing detriment of the ESOP and its participants and beneficiaries.

97.     This Court should exercise its equitable powers under ERISA to remove the current Trustee and appoint an independent, non-directed, institutional trustee with ESOP experience to manage the affairs of the ESOP.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. That the Court order Couturier, Johanson and Eddy to disgorge and restore to the ESOP any profits which have been made as a result of their wrongful conduct, through the imposition of a constructive trust; and that the Court grant such further equitable relief as it may deem just and proper including: removal of Eddy as ESOP Trustee and appointment of a neutral, institutional trustee;

B.  Attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g); and

C.  Such further equitable relief as the Court may deem just and proper.

DATED: October 11, 2005

MATTHEW RIGHETTI      (SBN #121012)
RIGHETTI ♦ WYNNE
456 Montgomery Street, Suite 1400
San Francisco, CA 94104
(415) 983-0900
fax (415) 397-9005

Local Counsel for Plaintiffs

**Of Counsel:**
Gary D. Greenwald
Anne Marie La Bue
SHAYNE & GREENWALD CO., LPA
221 South High Street
Columbus, OH 43215
(614) 221-1111
fax (614) 221-4070